CHANCERY.

*Yoder &c. vs. Atterburn; same vs. Standiford; same vs. Massie, and Atterburn vs. Yoder &c.; Standiford vs. same, and Massie vs. same. Six cases.*

Case 107.

Cross writs of error to the Jefferson circuit; J. P. OLDHAM, Judge.

*Mortgages. Practice in chancery. Fraudulent conveyances as to creditors. Sheriff's sales. Badges of fraud. Evidence. Errors. Dissents. Priority between creditors.*

July 1.

Judgments, executions, and levy, on the estate of E. Standiford.

Judge MILLS delivered the Opinion of the Court.

THOMAS PHILIPS obtained four judgments and executions, against Elisha Standiford; and Samuel Churchill obtained two against the same person. These six executions were all in the hands of the sheriff at the same time, and were levied by him, on one tract of 1500 acres of land, also another tract of about 300 acres, being the mansion farm of said Standiford, also a third tract of fifty acres, a fourth tract of 108 acres, ten slaves, four feather beds and furniture, a wagon and team of five horses with their harness, three other riding horses, forty head of cattle, fifty sheep, fifty hogs, one press,

one secretary, one desk, three tables, and a clock; all of the estate of said Standiford, and given up by him to satisfy said executions, which were all endorsed, that paper of the bank of the commonwealth would be accepted in payment.

The estate was sold on the 15th June, 1823, for the sum of 3,708 dollars, and Jacob Yoder became the purchaser, and all was conveyed to him by the sheriff in one inclusive deed, which was acknowledged and recorded on the 7th of November, 1823.

The estate all remained in the possession of the debtor, and was not removed.

On the 13th of July, 1824, David Standiford, another creditor, who also had a judgment and execution, and in the month of September following, Henry Massie, and Harrison Atterburn, who were also creditors by judgment and execution, each filed their separate bills in equity, charging that this sale and purchase of the property by Yoder, were made with intent to delay, hinder, and defraud creditors, and to the great sacrifice of the estate, which was of far greater value; and that it was designed to save the estate for the benefit of Standiford, and was therefore fraudulent and void; and praying that the said sale might be set aside, and the estate be again exposed to sale, in discharge of their respective demands.

Yoder, and Elisha Standiford, answered each bill, and contested the fraud, and contended that the sale was fair and *bona fide*.

The cases were ordered to be tried together.

The court below decreed, that the estate should be re-sold, under the direction of the court, by commissioners; and that Yoder should have the preference in having his claim satisfied; that is, the price which he gave for the property at the sheriff's sale; and that each of the others should follow in succession, giving the preference to the one which had his execution first endorsed by the sheriff.

To reverse these three decrees, Yoder and E. Standiford have prosecuted their three writs of error.

---

*Margin notes:*

Yoder &c.
vs.
Standiford &c.

Sheriff's sale, and conveyance to Yoder; and property left in debtor's possession.

Bill of D. Standiford, and of Massie and Atterburn, other creditors, alleging the sheriff's sale fraudulent, and praying the estate to be subject to their judgments.

Answers.

Decree of the circuit court.

Yoder and E. Standiford's writ of error.

YODER &c.
vs.
STANDIFORD
&c.

Atterburn's,
D. Standi-
ford's and
Massie's
writs of error.
Ground of
complaint by
Yoder and
E. Standiford
against the
decree.

And the three creditors, David Standiford, Massie, and Atterburn, have each prosecuted their several writs of error, against Yoder and E. Standiford. All these cases have been heard together in this court.

1. Yoder, and E. Standiford now contend that the sale was fair, and not made to defraud creditors, in any way; and that, therefore, the decree selling the estate is erroneous.

2. That if a sale is to take place on any terms, it ought not to be made by a commissioner or master in chancery, under the direction of the court; but that all the chancellor could do, would be to remove the incumbrance on the estate, and let loose the executions at law.

Grounds re-
lied on by D.
Standiford,
Massie, and
Atterburn.

On the contrary, D. Standiford, Massie, and Atterburn, contend that the sale, and deed made by the sheriff, in pursuance thereof, is fraudulent, and ought to have been held for nought, and that the court erred in settling the question of precedence between the parties; and that Yoder ought to be postponed to the whole.

Fair purchas-
er, at sheriff's
sale, under a
contract with
the defendant
that he may
redeem, holds
as in mort-
gage, and an-
other credit-
or may main-
tain his bill to
redeem, or
have a sale
and appro-
priation of
the proceeds.

The most favorable light in which this transaction between Yoder and E. Standiford, whereby the title through the sale by the sheriff was acquired in all E. Standiford's property, can be viewed, is to construe it into a mortgage. For however fair the sale might have been, it is in proof that by previous arrangement E. Standiford was to be allowed to redeem the estate, and a writing shewn by the defendants themselves, entered into after the sale, which will be hereafter more particularly noticed, also proves that E. Standiford was to be allowed to redeem or take the estate again at the end of four years. If then the arrangement is construed into a mortgage, it was competent for creditors by judgment and execution, to bring their bill to be let in to redeem or to compel the mortgagee to foreclose, or that the estate should be sold and the proceeds be applied, first to extinguish the claim of the mortgagee, and the residue to go to the creditors so suing. Indeed the decree rendered by the court below,

goes no further in its operation than a decree of this character. The title of Yoder is ordered to stand as an indemnity in his favor; or rather, he has the preference given him, in the distribution of the proceeds of the sale, for all the money which he had actually expended in making the purchase.

We will not detain to discuss the question of power in the chancellor to set up this estate at auction, under his own order, and in the hands of his own officer. For we deny that his power, when he has fair possession of a subject, stops short of complete justice, and that he is bound to drop the subject just at the very point of relief, and call to his aid the process or functionaries of a court of common law, to help him out of the dilemma. On the contrary, he can generally complete what he begins, and particularly if a sale is necessary for the ends of justice, he will direct and superintend it. To a sale thus directed, under his immediate direction, and subject to his immediate revision, there is generally, and ought to be, greater confidence given, than is to those of a court of common law, which are conducted by ministerial officers only, and afterwards do not receive judicial confirmation or approbation on the hearing of the parties, unless one of them shall move to set it aside.

The main question, therefore, in this cause, must be, is this title acquired by Yoder, fraudulent, and made with intent to delay, hinder, and defraud creditors?

The following is a summary of the facts relied upon by the creditors now contesting it.

At the time the sale was made, E. Standiford was much indebted, not only to those creditors whose executions had actually seized, and were about to sell the property, but there was another train in their rear, well known to both himself and Yoder. Indeed, at least one of those creditors, who now attack this sale, had his execution in the sheriff's hands at the sale, but not in time to act its part with those which sold the estate, and the others were pressing on to judgment.

VOL. VII.    3 L

---

YODER &c.
vs.
STANDIFORD
&c.

Where the chancellor sets aside a fraudulent conveyance, on the complaint of a judgment creditor, he ought to order the sale, and have it effected, and not turn the party back to his common law execution.

Main question stated.

Facts relied on to prove the sheriff's sale fraudulent.

Yoder lived in another county, and was an intimate friend of the family of the wife of E. Standiford, and was known to have the means to relieve the distresses of E. Standiford. Two or three days before the sale, E. Standiford paid him a visit, to get money from him, or to make some arrangements to save the estate. Yoder, according to his own account of the matter, would not furnish the money, but agreed to let the estate be sold, and to become the purchaser with the avowed design of favoring Standiford, or his family, supposing, that when he got the estate in this way, all conveyed to him, it would be more secure.

To effectuate this object, Yoder came to the neighbood a day or two before the sale, and purchased up at least two of the executions, and thus got the control of them.

On the day of sale, Yoder, as well as E. Standiford, and his connexions, persuaded the creditors not to bid, assuring them that their money was secure, and their debts would be paid.

Account of the sales.

On the day of sale, by the procurement of both Yoder and E. Standiford, the estate was put up in large lots, so as to compel purchasers to take all or none. For instance, three tracts of land, 1500, 50, and 108 acres, were together sold for $2,100; desk and book case at one dollar and fifty cents; a settee and a dozen of chairs at one dollar; four beds and bedding at $4; three slaves in one lot, $201; a negro woman and three children, $401; wagon and five horses, with their harness, $151; forty head of cattle, at $165; of the hogs and sheep, there is no account. But it is remarkable, that these lots were so managed as to amount with great precision to $3,708, the exact amount of all the executions then operating on the estate.

Property left in defendant's possession.

Not an atom of the estate was removed, or taken into the possession or use of Yoder, but all remained in E. Standiford's possession, as before. The intention was thus effectuated, and E. Standiford was favored and benefited by continuing the use and results of the estate.

On what terms E. Standiford was to retain it, we are not told, except in the answers of Yoder and E. Standiford. They exhibit a writing, or lease of the estate, between themselves, dated on the day of sale. It purports to lease the whole to E. Standiford and his brother-in-law, Joseph A. Brooks, from the first of July, 1824, to the end of three years; the lease to be forfeited if the rent was not paid annually, and Yoder to have the right to enter and dispossess the tenants for a failure; also, reserving to himself the right at all times to withdraw any of the slaves or personal estate, on making a proportionate deduction, or compensation, or substituting others in their place. The tenants, or lessees, are to keep the premises in good repair; to pay taxes and physicians bills; to feed and nourish the slaves and their increase; to keep up the stock of cattle and horses; to commit no waste, and to surrender the possession in good order and repair, natural wear excepted; yielding and paying as hire and rent $275, in gold or silver per annum. Yoder agrees *to accept the sum of $207 85, in gold or silver, and 90 bushels of salt, annually, in lieu of the $275, at the election of the tenants. Then this stipulation follows:

"Said Yoder, in consideration of esteem for said Joseph A. Brooks, and Nancy Standiford, wife of Elisha Standiford, who are children of his old friends, Joseph Brooks and Nancy his wife, agrees further, that if the said Joseph A. Brooks and Elisha Standiford or the survivor of them or their legal representatives, shall wish to purchase the property at the end of the lease, and shall tender and pay unto him or his legal representatives $3,500 in gold or silver, between the 31st day of May, 1827, and the 1st of July, 1827, and shall have paid up all taxes, debts, dues, and demands, that shall have accrued against said Yoder, by cause of his owning said possession, so as to save him harmless from all liability; and to give him the consignment of the said $3,500 aforesaid, free from all deductions and draw back, then the said Yoder shall sell the said property now leased or what shall be of said property, either by decrease or increase, unto them the said E. Standi-

*(margin note:)* Yoder &c. vs. Standiford &c.

Agreement between purchaser and defendant, as to the disposition of the property.

YODER &c.
vs.
STANDIFORD
&c.

ford and Brooks, or the survivor of them, or their legal representatives, and will convey the same, by deed of quit claim, with special warranty only, at their expense. But the said Yoder does not bind himself to convey in case of tender and payment, except only during the month of June 1827, and will not sell and convey after the 30th of June, 1827."

Evidence insufficient of the agreement between defendant and purchaser exhibited in their answers.

This writing appears to have been signed by Yoder and E. Standiford alone. Brooks has not signed it. There is no proof when it was executed, or that it was executed at all. There is one subscribing witness, whose testimony is not taken. Whether it really existed from its date, or is manufactured to suit this cause, does not appear, except by the answer of the defendants, one of whom admits its execution after its date.

It is further remarkable, that there is no provision in it for the rent of the first year after the sale. Thus long, E. Standiford seems to have been entitled to the premises rent free. The defendant, Yoder, however, in his answer, says that the rent of that year was omitted by mistake.

Manner of the payment to the sheriff of the purchase money, & the source whence it came.

The mode in which the price at the sale was paid, must not be omitted. Yoder receipted to the sheriff for the two executions, of which he had the control. He gave his sale bond, with Joseph A. Brooks security, to another creditor, for $418. This bond, when it became due, was paid and discharged by the debtor, E. Standiford. Yoder also paid to the sheriff, on the day of sale, $2,513, in notes on the bank of the commonwealth, or rather, this money was advanced on the day of sale, by Joseph A. Brooks, the brother-in-law, and was counted by Solomon Neill, another brother-in-law of Standiford, and passed by him directly to the sheriff, without going through the hands of Yoder. The mode in which this is accounted for by the defendants, Yoder and E. Standiford, is this. Joseph Brooks, the ancient friend of Yoder, alluded to in the lease, was indebted to Yoder at his death, about this sum, the payment of which he imposed by his will on his son, Joseph A. Brooks, and the will of Joseph Brooks, produced, thus far verifies this

statement. It is alleged by Yoder, that this sum Joseph A. Brooks secured to him, by his own bond, and that the money, on the day of sale, was paid by Joseph A. Brooks to the sheriff for Yoder, in discharge of this debt. Such was the color given to the transaction on the day of sale. But no bond from Joseph A. Brooks to Yoder was produced, or surrendered; nor is any shown in the cause, nor does it appear that he is released from this debt. He produced the paper on the bank of the commonwealth, to the nominal amount of this debt in specie, ostensibly for the purpose of paying this debt. Another of the family counted and gave it to the sheriff, and Yoder seems in this transaction to have been passive; so that a suspicion may be excited, that this was a family arrangement to save the estate of E. Standiford, in the name of Yoder.

Such are some of the prominent facts, relied on by the complainant below, to vitiate this sale, and we cannot help concluding from them, that this sale is fraudulent and void.

If it be admitted, that Yoder really paid down and secured a valuable consideration for this estate, it is not enough to enable the arrangement to escape the effects of the statute. Every such arrangement must be not only founded on a "good," which is construed to mean a *valuable* consideration; but it must also be "*bona fide.*" If it wants the latter requisite, it is as clearly fraudulent as if it wanted the former also.

It is true, that this sale was effectuated in satisfaction of real debts, and in the fraud the creditors seem not to have participated, but only remained passive. Their object was to get their money without concurring with any arrangements between the debtor and the purchaser. It may therefore be urged, that Yoder is clothed with the rights of those creditors, and that the sale is clothed with the sanctions of the law and therefore it cannot be attacked as fraudulent.

The act to prevent frauds and perjuries was designed to leave property naked to the free course of

Sales, to be valid against creditors, must be not only for a valuable consideration, but *bona fide.*

Purchaser under the executions of *bona fide* creditors, is not protected by *their* merit in his purchase he makes in combination with the debtor, to hinder, delay or defraud other creditors.

the law, and to keep impediments out of the road of honest creditors. It was foreseen by the legislature, that these provisions against fraud, might be made the shelter of fraud; and that a debtor knowing that the cause of the creditor and the means afforded him for the recovery of debt were held sacred, might, and probably would, endeavor to take protection under it, and to surround himself with the formalities of law and the rights of the creditor, and thus be placed in a fortification impregnable. To guard against this, and to prevent the law, made to prevent frauds, becoming the shield of fraud, the legislature expressly extended the provisions of the statute to every judgment, or execution, as well as every other mode of transfer, if it was not *bona fide*. We need not then talk of legal solemnities as a shield, if they were acquired or applied with intent to injure creditors; nor need we bring up the rights of creditors, acquired by Yoder, if they have been used by him to fix this estate of E. Standiford beyond the reach of other creditors, while the debtor should enjoy it securely. *Certainly, it never could* have been intended, that the advantages and preference obtained, even by an honest creditor, should be used as an obstacle to others, by so fixing it to the estate as to become a perpetual shield. If, therefore, the debts which sold this estate were honest, and the preference acquired by these creditors, in their fair and honest pursuit of their debts, has been used by the present owner thereof, to secure the estate to the debtor secure from another host of creditors, yet in the rear, but in ardent and legal pursuit, he must be stripped of the advantage, and stand as any other fraudulent grantee. For neither the words of the statute, or principles of equity, recognize any distinction in his favor.

Facts which are badges and evi'ences of fraudulent sales—

The different facts on which the complainants rely to prove fraud in this sale and conveyance, are such as have ever been held by all chancellors, and courts of common law, as badges and evidences of fraud.

—Contrivances to protect

The previous arrangement proves, that something more was intended than barely relieving the pres-

sure of debt then pressing upon E. Standiford. That was not the only easement intended. Security against a future group of creditors was designed. If present relief was the object, advancing the money on loan, secured by mortgage, would have done it. In this arrangement, he was to favor the debtor. How was this to be done? By bidding off the estate and acquiring a title in legal form, and the favor was to consist in permitting the debtor still to enjoy, and in keeping off the hands of the remaining creditors.

To effectuate this object, every arrangement was to be made, by setting up the estate *en masse*, so that it was exactly to extinguish the active executions and no more, and yet be acquired at an enormous sacrifice, as the proof in the cause abundantly shews. Another circumstance not hitherto noticed, is calculated, to induce this belief. Atterburn, one of the present complainants, was present, and his execution was *endorsed*. *On its being suggested, that by bidding, the estate* might extend far enough to cover his debt, he bid for one of the slaves, and the mother-in-law of E. Standiford appeared against him as a competitor in bidding, and spoke with some warmth to him for attempting to bid. His ardour was damped, by this *competition* with the mother of the wife of the sinking debtor. The slave was striken off to Mrs. Brooks, but was afterwards placed among the purchases of Yoder, and was gotten by him, through her instrumentality.

But if there was no other circumstance, the possession of this estate, being all the debtor owned, remaining with the debtor, is one which cannot be overlooked. This possession, even according to the lease produced, was to be gratis for one year, and the debtor was, during that time at least, the absolute possessor, and Yoder on record the absolute owner. This is strong evidence to shew the previous arrangement, or secret understanding, that the beneficial interest in the property was still to be E. Standiford's. We well know that this is not the mode in which men, ordinarily prudent, manage their money. They do not usually lay out their money to

YODER &c.
vs.
STANDIFORD
&c

purchase estates, to be enjoyed by others without affording to them the least return on the capital; and some extraordinary reason must exist for such an occurrence. Indeed, seeing a person in possession of an estate, enjoying all its benefits, when it is mortgaged, and the condition of the mortgage, long forfeited, and the mortgagee lying supinely by, not wishing to enjoy or use his money, and many creditors of the mortgagor remaining unpaid, does create in the mind of every one, a suspicion, that it is a secret arrangement to secure the mortgagor against disturbance from creditors. The weight of such a circumstance, is sufficient to repel the presumption of fairness; and to induce a belief of a secret and unexplained understanding between the parties. Indeed, possession in the grantor, while title is in the grantee of an absolute conveyance, has been often held, by the settled law of this court, to be conclusive evidence of fraud.

Effect of the
mortgagor re-
maining in
possession.

The same doctrine has been applied, by many of the American courts, as well as those of Great Britain, to mortgagees, even when it is stipulated on the face, that possession shall remain with the mortgagor, as is shewn by Mr Kent in his commentaries, vol. 2, p. 405, *et seq.*

But we need not enquire into the soundness of this doctrine, on principle. For if we admit the true doctrine to be, that in the case of a mortgage, possession of the mortgagee is consistent with the deed; at all events continuing that possession after the condition is forfeited, without disturbance from the mortgagor, is calculated to induce a belief, that the mortgage is one of an amicable character, to answer the particular purposes of the debtor, rather than a real security for the debt named on its face.

Secret ar-
rangement
between the
debtor and
the purchaser
of his estate
at sheriff's
sale, contriv-
ed to defraud

But the present case is not a mortgage. The right of redemption no where appeared on the face of the deed. That was a secret arrangement between the debtor and grantee. It is true, this was not a deed executed directly from the debtor to the grantee; on its face it shewed the forms, solemnities, and energies of the law, forcing the estate from the debtor, and fixing it in the grantee. But yet, if this was

done by a secret arrangement between the debtor and purchaser, clothed with forms, but not the substance of the law, in order that the debtor might enjoy while the grantor before the world had the absolute estate, it cannot substantially differ from an absolute deed executed by the debtor himself, and possession therefore must be high evidence of fraud.

With this conclusion every attending circumstance concurs. The money is gotten from the family. They all concur in the arrangement, and the debtor afterwards discharges and satisfies the only sale bond which is given. The money paid, is ostensibly in discharge of a debt coming from a brother-in-law. His security is not surrendered, and no receipt is given. The money is carefully passed through the hands of another brother-in-law, now used as a witness, and conveyed by him safely to the sheriff, without being suffered to touch the hands of Yoder; and the estate is sacrificed for less than half its value, being the whole the debtor had, and he still in debt. Can it be believed that Yoder intended to make a speculation merely, and that he should afterwards forget to enjoy it? Can it be supposed that he was so generous as to pay such a sum, and lie out of the use of it for one year, without any remuneration, or with a bad prospect of rent or interest for three years more, and that to do a kind action to Standiford, without including in that kindness a protection against creditors? Is not the belief more plausible, that the arrangement was to secure the debtor in the estate under color of a sheriff's sale and that the lease now produced is an after-thought, framed to meet the demand of creditors? We conclude that it is, and that this sale and deed is within the letter, as well as the spirit of the act; they were made with intent to delay, hinder and defraud creditors, and are not *bona fide*.

It may be said, that this conclusion is severe, and against those fine feelings of the heart, displayed in an act of benevolence, and that Yoder ought to have been permitted to extend his kindness to his friend. Not so. The exercise of pure benevolence is not cramped by the conclusion; but only that which is

*Margin notes:*
Yoder &c. vs. Standiford &c.

other creditors, shall not be construed a mortgage to give it effect.

Evidence of the fraudulent intent.

Benevolence exercised towards debtors, to protect their property from their just creditors, denounced.

YODER &c.
vs.
STANDIFORD
&c.

impure. The creditors of Standiford had a moral right to his estate, and if the benevolence of Yoder has been exercised with an eye to obstruct that right, his benevolence is converted into corrupt design, loses all its merit, and is not entitled to the name.

Judges Owsley and Mills concur as to the proof of the fraud, chief justice Bibb dissenting.

Thus far there is a concurrence of opinion, in the majority of the court; while the chief justice conceives that there is no fraud established, and that the decree ought to be reversed at the prayer of Yoder, and all the bills dismissed.

But as to the consequences which must follow from the fraud, a difference of opinion between the two judges who agree in the existence of fraud, arises.

Judge Owsley's opinion, that though Yoder's purchase was fraudulent, he is entitled to the preference which the owners of the executions had, which he thereby satisfied.

Judge Owsley conceives, that although the conveyance, or title of Yoder, is fraudulent, yet, as he came in under creditors whose executions had a prior lien, and were clear of fraud, Yoder ought not, as a defendant in a court of equity, to be placed in a worse situation than the creditors were; that, stript of his own title, on account of the fraud, he must be left in possession of theirs; and therefore, while he is of opinion there ought to be no reversal at Yoder's instance, he also thinks that the decrees ought not to be reversed at the prayer of the creditors to grant them more, because the decrees have only left Yoder in possession of the rights of the creditors under whom he acquired the estate.

Judge Mills opinion to the contrary.

Judge Mills conceives, that if Yoder is guilty of a fraud, and if his title comes within the act to prevent frauds and perjuries, it is, according to the letter of the act, absolutely void, and can have no force for any purpose, and that no regard is to be paid to its inception, or the purity or impurity of the executions under which it arose; and that, consequently, Yoder ought to stand as a general creditor, and be allowed to come in only after the creditors, who have acquired a legal preference, are satisfied; and that for this purpose the decree, at the instance of the creditors, ought to be reversed.

Affirmance of all the dec's

On this point, as the chief justice does not admit that the decrees against Yoder are correct, he will

not concur in the reversal, for the purpose of making Yoder's case more unfavorable. It follows, therefore, from this division of sentiment, that in all the writs of error there must be an affirmance. In those of Yoder, the chief justice dissenting, and in those of the creditors judge Mills dissenting.

We shall barely add, that as between the creditors themselves there can be no doubt that the disposition among themselves is right; that though equity generally prefers equality, and directs debts to be paid proportionably, yet the rule does not hold good, when a preference has been obtained at law. There equity follows the law, and leaves the advantage with him who has gained it, especially where the fraud is of a legal and not of an equitable character: Codwise vs. Gelston, 10 John. 507; Messonier vs. Gomperts, &c. 3 John. chy. rep. 3; M'Dermutt vs. Strong, 4 John. chy. rep. 687.

In all the cases the decrees are affirmed, with costs.

*Dissent of Chief Justice* BIBB *to the opinion of the court on the evidence of the fraud alledged in the purchase at the sheriff's sale.*

SIX several executions were delivered to the sheriff of Jefferson county, on the 14th day of April, 1823, against the estate of Elisha Standiford, which were levied by the sheriff, on the 14th of May, on fifteen hundred acres of land, whereon Standiford lived, including half the salt water, including his farm, fifty acres sold by Breckenridge &c. to John Murphy and J. C. Beeler, and 108 acres, part of Edward Rice's claim; also on ten slaves; a waggon and horses, and harness, three riding horses, 40 head of cattle, 50 head of hogs, 50 head of sheep, and various articles of household furniture. The estate was advertised by the sheriff, and sold on the 14th June, 1823, amounting in the aggregate of the parcels sold, to the sum of three thousand, seven hundred and eight dollars, being the amount of the said six executions and sheriff's commissions. Of these executions, two, amounting to $777 04, were for the use of James Guthrie who transfered them to Jacob Yoder; the other four, were in favor of Thomas Phillips.

*Margin notes:*

YODER &c.
vs.
STANDIFORD
&c.

in consequence of different opinions among the judges.

Judgment and executions creditors for whom fraudulent conveyances are set aside, entitled to the preference in equity they had at law.

Dissent of ch. jus. BIBB.

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

Jacob Yoder became the purchaser of the whole of the property; he gave receipts to the sheriff for the amount of the executions so assigned to him, paid down to the sheriff the sum of $2,513, and executed his bond with security, payable at three months, to Thos. Phillips for $418, according to law, which satisfied all those executions, with the sheriff's commissions, and they were so returned by the sheriff; all these executions were indorsed as receiveable in paper of the bank of the commonwealth.

At June term, 1822, Atterburn had judgment against Elisha Standiford, for $663 debt, with interest from 7th March, 1822, till paid, besides costs. The last which issued on this judgment, in May, 1824, was returned, no property found.

At March term, 1824, David Standiford had judgment against Elisha Standiford, for $838 debt, with interest from 9th March, 1820, till paid, beside costs. An execution on this judgment, *bearing teste on the 14th March, 1824,* (with the credit noted in the judgment, of $125 90, paid 25th June, 1823,) was returned by the sheriff, no property found.

Henry Massie alleges, that he obtained judgment against Elisha Standiford for $180, with interest from 26th Dec. 1822, and costs; and that a *fieri facias* upon his judgment was returned by the sheriff, no property found; but this judgment and execution is not exhibited.

In July, 1824, David Standiford exhibited his bill against Yoder and Elisha Standiford; on the 20th September, 1824, Massie exhibited his bill against Yoder and Elisha Standiford; and on the 27th of September, 1824, Atterburn exhibited his bill against Yoder and Elisha Standiford; each creditor stating his judgment and execution returned, no property; referring to the sale by the sheriff on the 14th June, 1823, and the purchases by Yoder of the property, and to the sheriff's return thereof, and praying that the sale to Yoder might be decreed to be fraudulent and void, and that the property, or so much as may be necessary, may be sold, and the proceeds applied to satisfy his debt; and for such other relief as the case may require.

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

These suits were afterwards consolidated, the proofs in one to be read in each, and a joint decree on the three bills was rendered.

The charges to impeach and invalidate the sale and sheriff's deed to Yoder, are: that E. Standiford "for the purpose of securing said property from, and of cheating and defrauding his other creditors, procured said Yoder to purchase the whole of said property, at the sale aforesaid, for the use and benefit of him, the said Elisha, as he did, for about the sum of $3,708, in notes of the bank of the commonwealth, then not worth more than fifty cents in the dollar," when the property was worth about $18,-400.

That to effectuate this, Yoder and said Elisha Standiford dissuaded other persons present from bidding against said Yoder; had the three tracts of land cried off in a single lot; three of the negroes in one lot, four in another, two in another; the waggon and five horses in another; the 40 head of cattle in another.

That the sum of $2,513, in bank notes, which were paid down at the sale, were received by Yoder from said Elisha for that purpose.

That before and since the sale; Yoder had frequently declared that he made the purchase for the use and benefit of said Elisha; and that he only held the property until he was indemnified, and paid what was actually due him by said Elisha, which they charge to be short of eight hundred dollars; that in pursuance of said agreement, said Yoder has suffered the whole of the property to remain in possession of said Elisha, who continues to act over it as the visible owner and proprietor.

Yoder, by his answer, exhibits the deed of the sheriff to him for the property, sold at the prices stated in his return on the executions, viz: 1,500 acres of land on Pond Creek, including the farm and half the salt water, and 108 acres on Pond Creek, and 50 acres on Fern Creek, at $2,100; desk and book case at one dollar fifty cents; secretary at two dollars fifty cents; table at fifty cents, one other ta-

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

ble at fifty cents; settee at one dollar; one dozen chairs at one dollar; clock at one dollar; one press at one dollar; one table at fifty cents; four beds and bedding at four dollars, three negroes, Alice, Priscilla, and Robert, at $201; Patience and her three children, at four hundred and one dollars; boy, Sam, at $31; man, Leonard, $253; Isaac at $381; waggon and five horses, and harness, $151; gray horse, ten dollars fifty cents; roan mare at one dollar; forty head of cattle at $165; in all, $3,708; which deed bears date on the day of the sale, and is duly admitted to record.

He states that he does not know the real value of the property, but that the value put on it by the bill is, in his belief, in every instance, greatly exceeding the truth; that he believed he was purchasing good bargains at the time; but no better than is usual at sheriff's sales; and that he had for competitors other bidders, particularly Thomas Philips, the plaintiff in four executions, and Harrison Atterburn, one of the complainants.

He denies that he dissuaded any one from bidding, or that he has any knowledge that Elisha Standiford did.

He denies that the purchase was made to defraud the creditors; he denies that he made the purchases, or any of them, for Standiford, or his use, but for himself as sole owner.

He admits he leased the property to E. Standiford, or to him and Joseph A. Brooks, for $275, per year, in specie, for four years, with liberty to them, or the survivor of them, to purchase the property by paying him the sum of $3,500 in gold or silver, between the 31st May, and 1st July, 1827, if they shall choose so to do; according to the writing by him exhibited, executed on the 14th June, 1823; but that they, nor either, were bound so to do.

He admits he has stated, that he would be satisfied with the payments stated in that agreement; and that he had given Standiford four years to pay the same; but he denies that he ever made any statements different from the said writing.

He denies that the $2,513, paid to the sheriff, were paid to him by Standiford or any part thereof; but that he held the bond of Joseph Brooks, deceased, for twenty odd hundred dollars, who held the bond of Joseph A. Brooks for the like or a greater sum, and *by his* will directed the said Joseph A. Brooks to pay the sum due the said Yoder; this sum was due in specie; that Joseph A. Brooks gave his own bond and took up his father's bond. Shortly before the sale the said Yoder agreed with said Brooks, that in case he, Yoder, became the purchaser, and if he, Brooks, would pay the amount of said bond in bank notes, he would accept the same instead of specie, dollar for dollar, and when he did become the purchaser at the sale, the said Joseph A. Brooks did pay the said $2,513, which he, said Yoder, accepted as so much paid on the bond, and delivered it *to* said Joseph, who was good and solvent; that he agreed to that arrangement, believing, that if he did purchase at the sale, he would procure property *at terms sufficiently* advantageous to indemnify *him for the difference* between Bank notes and specie.

That he did procure from Guthrie an assignment of his executions, and did allow him therefor, specie, dollar for dollar; that the notes were at the time at 195 for 100.

That he has not permitted said Elisha to have any use or possession of the property, except as lessee, as aforesaid; and has not received any part of his money so paid for the property.

The answer of Standiford denies that the purchase by Yoder was procured by him to defraud his creditors.

He states, that before this sale, Thomas Phillips, under a prior sale by execution, had purchased twelve hundred acres of land belonging to said Elisha, at twenty dollars, and still insists on his purchase; and James Guthrie, another of the plaintiffs in said executions, had, at a previous sheriff's sale, purchased three hundred acres of his land, for forty dollars; and but for the bidding of Yoder, he be-

YODER &c.
vs.
STANDIFORD
&c
——————
Dissent of
ch. jus. BIBB.

lieves that his estate would have been sacrificed in a manner utterly and hopelessly ruinous to said defendant, Elisha; and his said creditors would have been left unpaid; that to prevent the ruinous sacrifices, like those formerly experienced by him, he did apply to Yoder to become a bidder; and afterwards procured the lease stated in Yoder's answer, with liberty to buy the property, if he could, on the terms therein stated; the respondent flattering himself with a hope that he could in that time be enabled to pay Yoder, and thereby also satisfy his other creditors.

He denies that Standiford furnished the whole, or any part of the said sum of $2,513, paid by Yoder on the day of sale.

He denies that said sale was to the injury of his creditors, or with intent to cheat or defraud them; but on the contrary, he then believed, and yet believes, that the arrangement with Yoder was the best in his power for his creditors or himself, and without it that he would have been ruined, without the possibility of paying his debts; he has paid no part of the said amount to Yoder.

Upon hearing, the circuit court decreed, that the said property so purchased by Yoder should be delivered to the commissioner appointed by the court, to be by him sold, or so much, as necessary; first, at three month's credit, for notes of the bank of the commonwealth, to satisfy Yoder the sum of $2,690, with interest at six per cent from the 28th June, 1826, till paid, including also the sum of $40, allowed the commissioners for making the sale; the residue on a credit of two years, to satisfy the complainants, unless they will endorse to take bank notes of the commonwealth; in that case the sale to be at three months credit.  The land purchased by Guthrie formerly, and sold by him to Yoder, not to be included in the sale, but to be retained by Yoder, and the said 1,500 acres to be laid off so as not to include said Guthrie's purchase of 300 acres.

The creditors of Standiford complain of this decree, that they have been postponed to Yoder.

Yoder complains, that his demand has been reduc·

ed in the amount; and that such reduced sum is to be paid in paper, instead of coin; with various other objections to the details, and to the decree, in avoiding his purchase.

YODER &c.
vs.
STANDIFORD &c.

Dissent of ch. jus. BIBB.

As to the value of the property, stated by the bill to have been purchased by Yoder, the evidence furnishes no data from which the aggregate value can be computed. But the value set down in the bill is evidently the exaggerated suggestion of the attorney, like the allegations in declarations of trespass for cutting ten thousand oaks, and four hundred firs, and one thousand beeches, and five thousand ashes, &c. of the value of $20,000; in which the attorney makes sure to state more than he expects to be proved, so as to let in his client to prove as much as he can.

The value of the land cannot be ascertained; the complainants have taken the deposition of Thomas Phillips, the plaintiff in four of the executions, who states, that of the 1,500 acres, some of it was worth from four to six dollars per acre, in specie, but how much he cannot say; but the greater part was of such inferior quality, that the witness would hardly pay the taxes for it; that for the 108 acres, Elisha Standiford gave ten dollars per acre, but he does not believe it was at the sale worth half that much; the 50 acres he thinks "worth more than any of it; it is worth from four to six dollars specie per acre." Two or three of the negro men, he thought worth $400 in specie, each; the value of the women and children he does not know. The cattle he thought worth six or seven dollars specie per head; the wagon and horses and gear he supposes worth $500 or $600 in specie. He can not say what the land purchased by Yoder was worth; at two former sales, under his executions, he bought about twelve hunred acres, adjoining that purchased by Yoder, for about twenty dollars commonwealth's paper, part of the same tract.

By the deposition of Mr. Guthrie, it appears, that he had, under an execution, purchased at sheriff's sale, three hundred acres, part of the tract on which Standiford lived, for forty, or forty odd, dollars; this

YODER &c.
vs.
STANDIFORD
&c.
_____
Dissent of
ch. jus. BIBB.

was the amount of the smallest of three executions he had. He then sued out his other two executions again, which were the two under which Yoder purchased. These 300 acres he believes worth from two to three dollars per acre, in specie; and understands they are included in Yoder's lease to Standiford.

Mr. Phillips farther states, that, the night next but one before the sale of Standiford's property, Yoder staid all night with Phillips, and told him that said Standiford and Squire Brooks, the brother-in-law of Standiford, had gone to his, (Yoder's) house, and brought him down from another county to attend the sale; "that through their persuasion, and in order to favor Standiford, he was going to purchase the property; and that Standiford (as near as he recollects,) was to have four or five or six years to redeem it in."

When the sale commenced, he, Phillips, commenced bidding, to make the property come to the amount of his executions; Yoder complained of him, and requested him to desist. Upon cross interrogation, by defendant, Phillips explains this, and says, that Yoder did nothing but to tell me, Phillips, "not to bid; that I had run the property up high on him; that I should have my money." That Standiford and Joseph Brooks also importuned him not to bid, before and during the sale. He also acknowledges, that before the sale, he Phillips endeavored to persuade Yoder not to bid at the sale, his reason for persuading Yoder not to attend the sale, was, because "I had made an arrangement with old Mrs. Brooks to secure me my money in two, three, and four years, and to give her the benefit of using my execution, and I expected, that if Mr Yoder attended at the sale that arrangement would not be made;" "that arrangement with Mrs. Brooks, was made in presence of Standiford."

Phillips, in his second deposition, states, that about the time the sale bond given by Yoder became due, Standiford paid him the amount in the clerk's office, and he gave a receipt in full against the bond, but he does not know whose funds Standiford paid with; Yoder is not in the habit of travelling about much.

Francis Smith states, that on Monday before the sale, Standiford left home and returned on Wednesday, with Yoder; from conversations in the family, he understood that Standiford had gone for the said Yoder for the purpose of making some arrangement to save his property; and in a conversation with Yoder, he observed, "that he supposed he would have to assist these people, meaning Standiford. From the conversation I had with Yoder, I understood that he, the said Yoder, was to become the purchaser of the property of said Standiford, and let it remain in his hands for some time, for the purpose of enabling him to redeem it at some future period."

Phillips states, that he advised the complainant, Atterburn, to bid, that there was property enough to pay his execution, which was then in the sheriff's hands; Atterburn said he would bid for the negroes; and it appears, from the deposition of Mr. Buckner, that Atterburn did bid for one of the negroes; Mrs. Brooks overbid him, and said she would have the negro if it cost her a thousand dollars; Atterburn bid no more.

It appears, from the deposition of Mr. James Guthrie, that he, having two of the six executions, attended the sale; Phillips' executions, amounting to near three thousand dollars, were first to be satisfied; Guthrie, not having money to pay Phillips' prior executions, and not wanting property, was apprehensive that without becoming a purchaser of property he did not want, he might lose his debts; in that situation, before the sale commenced, he transferred his executions to Yoder; also the benefit of his former purchase of the 300 acres of land, which he had bought under another execution. Yoder gave him the amount he bought the land for, also the amount of a note he held on Standiford for eighty or eighty five dollars, in specie, not included in the executions, and also the amount of his executions; and therefor Yoder executed his bond with Joseph A. Brooks, his surety, payable in three months, which was paid afterwards by Yoder, in specie, amounting to $944 50. Before the sale com-

YODER &c.
vs.
STANDIFORD &c.

Dissent of ch. jus. BIBB.

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

menced, Guthrie endorsed his executions for the benefit of Yoder.

Yoder declared, during the sale, he did not care about Standiford, but he disliked to see the children of his old friend Brooks suffer, and that if any thing could be saved out of the property, after paying the money he advanced for the property, in specie, he meant to let them have it.

It appears, from the deposition of Thomas Phillips, Squire Brooks, and Solomon Neil, and the will of Joseph Brooks, that Joseph Brooks owed Yoder a debt, which amounted to $2,512 50, in specie. This debt, Yoder, before the sale, agreed to take from Joseph A. Brooks, the son and devisee of Joseph Brooks, (who by the will was directed to pay this debt) in paper, provided he, Yoder, became purchaser to that amount, and provided Joseph A. Brooks would pay the paper on the day of sale, the sales being for paper of the Bank of the Commonwealth, then at a depreciation of two for one: when Yoder became purchaser, Brooks did pay the money to the sheriff, for Yoder, who surrendered the bond he held on Brooks.

By the depositions of Thomas Phillips, James Guthrie, Solomon Neil, Squire Brooks, and Thomas Buckner, who were attending, it appears that the sale was conducted fairly and properly by the sheriff; nor is there any colour of evidence, that the sheriff was in any manner controlled or influenced in conducting the sale, by the advices, desires or solicitations of Yoder or Standiford, or by any thing other than his own sense of duty.

It appears, that Mrs. Standiford, wife of Elisha Standiford, the defendant in the executions, was the daughter of Joseph Brooks, deceased; she was the sister of Joseph A. Brooks, and the sister-in-law of Solomon Neil, he having married a daughter of Joseph Brooks; Yoder was an old and intimate friend of Joseph Brooks, the father of Mrs. Standiford.

It appears, from the deposition of Mr. Guthrie, in answer to an interrogatory put to him by the complainants, that he did not believe that Solomon Neil had the means to prevent Standiford's property

from being sold; he believed that Joseph A. Brooks had the means, but for reasons stated at the time, was not disposed to aid Standiford, or purchase his property, but that Neil and Brooks appeared anxious that Yoder should become the purchaser.

*Yoder &c.*
*vs.*
*Standiford &c.*

*Dissent of ch. jus. Bibb.*

The lease from Yoder to Standiford bears date on the 14th June, 1823, and is for four years; it is prepared as a lease to Standiford and Joseph A. Brooks, but it is not signed by Brooks. By the terms of the lease, Yoder reserves the complete dominion over the slaves and personal property; he is at liberty to take into his possession, at any time, all, or any of the slaves or articles of personal property, by substituting others, or by allowing reasonable deduction from the rents, or making reasonable compensation, he reserves a rent of $275 in specie clear of all taxes, doctors' bills and expenses; the lessee not to commit waste, but to preserve, nourish, and keep in good order, the negroes and stock, and demised premises, with liberty, however, to the tenant to pay $207 85 in gold or silver, and ninety bushels of salt, delivered at Manslick, in lieu of the rent of $275. Yoder, "in consideration of esteem for said Joseph A. Brooks, and Nancy Standiford, wife of Elisha Standiford, who are children of his old friends, old Joseph Brooks, and Nancy his wife, agrees further, that if the said Joseph A. Brooks and Elisha Standiford, or the survivor of them, or their legal representatives, shall wish to purchase the property at the end of the lease, and shall tender and pay unto him, or his legal representatives, $3,500 in gold and silver coin, between the 31st day of May, 1827, and the first day of July 1827, and shall have paid up all taxes, rents, all debts, dues and demands, that shall have accrued against said Yoder by cause of his owning said possessions, so as to save him harmless from all liability, and give him the consignment of the said $3,500 aforesaid, free from all deduction and drawback, then the said Yoder will, or his heirs, &c. shall sell the said property, either by decrease or increase, unto them the said Standiford and Brooks, or the survivor of them," &c.—"and will convey the same by deed of quit claim, with special warranty &c."—But said Yoder does not

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

bind himself to convey in case of tender and pay-
ment, except only during the month of June, 1827,
and will not sell and convey after the 30th of June,
1827."

By the depositon of James Martin, it appears, that
he, desiring to purchase the fifty acres of land ad-
plied to Standiford, who told him it belonged to
Yoder, he applied to Yoder and purchased fifty acres
for three hundred dollars. This was after harvest,
in 1824. Murphy, in whom the title was, and Stan-
diford and Yoder, joined in a deed to him. He has
paid Yoder one hundred and fifty dollars, and Yoder
has judgment for the residue, $150, yet unsatisfied.
It does not appear that Standiford has exercised any
other right over the property than as lessee.

It does appear, from the depositions of Phil-
lips, Smith and Squire Brooks, that before the sale,
Standiford and Squire Brooks went up to Yoder's;
that Yoder came down with them, with intent to bid
at the sheriff's sale for the property; and it is not to
be doubted, from the facts and circumstances, that
Yoder's intentions in bidding for the property were,
after securing himself, to befriend Standiford's fami-
ly; and it is equally clear, from the facts detailed,
from the persons who were attending the sale, and
from the circumstances attendant on it, that if Yo-
der had not bid, but had yielded to the persuasions
of the creditor, Phillips, that creditor would have
been the bidder, without any rivalry competent to
make the sales produce more, if so much as Phillips'
own executions.

It is objected, that three parcels of land were sold
together; that lots of three or more slaves were
sold; the wagon, team, and harness in another lot;
and 40 head of cattle in another lot. The evidence
of these facts rests in the return of the officer
upon the precepts under which he acted. That
these lots were counselled, advised, or requested
by Yoder or Standiford, or flowed from any other
source that the discretion of the officer conducting
the sale, cannot be with truth asserted, from any
fact, or inferrence from a fact, detailed in evidence.
Atterburn, one of the complainants, was there; his

judgment was of 1822, and his execution was also in the hands of the sheriff; he witnessed the sales; if those were valid objections to the sale, if his interests had been thereby prejudiced, the court whose precepts had been abused, had full power and authority, in a summary way, to quash the sales. But then the effect would have been a re-sale, subject to the liens of the executions according to their respective priorities; Phillips' four executions, amounting to near three thousand dollars, and the two for the use of Guthrie, assigned to Yoder, would have had still their priorities over Atterburn. From the evidence the inference is fair, that the three parcels of land described in the sheriff's return, as derived to Standiford from several sources, were in fact contiguous and constituted, whilst owned by him, one tract; that the negroes were so sold in lots from motives of humanity; and that no injury has resulted to any one, nor any diminution of price, by reason of selling the land in one lot, the slaves in several lots, and the cattle in another. The time necessary for other duties of the officer, as well as his own judgment and discretion, must, to some extent, be consulted in selling by classes or by individualities. Would any court order the sheriff to sell forty head of cattle, and fifty head of hogs, and a dozen chairs, one by one? or to separate the mother and her children? If no abuse of authority, or of the discretionary powers confided to the officer, is made to appear, the court ought not to invalidate the sale. (Lawrence vs. Speed, 2. Bibb, 404.)

That the $2,513, paid on the day of sale, were furnished by Standiford, as charged by the bill, is not supported by the proof. It is clear that Yoder purchased with his own means and money.

The bill charges, that Yoder and Standiford dissuaded others from bidding against Yoder. What were the arguments used, and with what success, the bill does not explain; they might be innocent or guilty, according to their kind. The answers deny the charge. The only explanation of this charge rests upon the solitary deposition of Phillips, the creditor, who himself solicited Yoder not to bid,

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

that his own executions might be predominant; but Yoder did bid. This charge in the bill dwindles down to this; Yoder "told me not to bid, that I had run the same (the property) up high on him; that I should have my money." It does not appear that Yoder's request to Phillips had greater effect on him, than his previous request had on Yoder.

But Phillips states, that some of the negroes were knocked off to Mrs. Brooks, the mother of Mrs. Standiford. Yoder said to her, she must give up her purchase to him; Phillips did not hear her reply. Solomon Neil, however, states she did relinquish her bid to Yoder; the officer so understood, and has returned Yoder as the purchaser. This is catching at straws. See Small & Carr vs. Hodgen, 1 Litt. 16.

We are then brought to the inquiry, whether the purchases made by Yoder under these executions, with his own means and money, ought to be impeached, and set aside in equity, because of the friendly intent of Yoder to aid and assist the family of Standiford, by giving Standiford time to repurchase the property if he could.

What is there in this transaction to impeach the sale by the sheriff, and the purchase of Yoder thereunder, as unlawful, and made with intent to defraud, hinder, or delay the creditors of Standiford? The judgments and executions of Phillips, and of Samuel Churchill to the use of Guthrie, which were levied upon this property, and under which the sale was made, are not impeached. The sale was by authority, and in obedience to law, at the instance of creditors, by force and command of their lawful precepts to the officer; no collusion of the officer of the law with Standiford, or with Yoder, is proved; no evidence gives color to such a suspicion against the sheriff who conducted the sale. What "malice, fraud, covin, collusion, or guile" was had, made, or contrived against creditors, to delay, hinder, or defraud them; or to delay, hinder or defraud the complainants in particular?

By the levy of the executions, those creditors acquired the specific lien on the property; the sheriff

was bound by law and the duties of his office to sell the property; he did sell according to law and the duties of his office, without fraud or collusion. By the seizure, the title of Standiford was divested, and the property was by law vested in the sheriff; he sold and conveyed it to Yoder. Why has not Yoder a good title? Did the intent of Yoder to act as a friend to Standiford's family authorize the sheriff to reject the bids of Yoder? What wrong against creditors, or what evil against society, did Yoder commit in his biddings for this property? Why is the sale required to be advertised, open, and public, but that every one who will may bid?

By law, the property seized and sold under those executions, was not required to be sold for any given portion of its value; it was to be sold for whatever it would bring, not by appraisement. By the former examples of sales of his property, of 1200 acres for $20, and of 300 acres for about $40, as well as by the well known history of sales in this state under *executions*, Standiford had good reasons to expect enormous and ruinous sacrifices of his property under those executions, unless he could produce more than ordinary competition in the biddings. In this situation, he was bound, however, in seeking measures for lessening the stroke of calamity, to conduct himself lawfully; to abstain from fraud, collusion or guile, to delay, hinder or defraud his creditors. But was he forbidden to use means to enhance the prices of his property at the sales under execution? Was he forbidden to use means to prevent one creditor, whose executions held the prior lien, from engrossing the whole estate, to the exclusion of the other creditors? Was he bound to fold his arms, stare ruin in the face, and resign himself quietly to penury and despair? Was he forbidden to ask the aid of friends, or to appeal to the sympathies of society? Were his connexions and friends prohibited from becoming bidders at the sale, and creditors, and those estranged in feeling and sympathy from himself and family, the only invited and lawful bidders? Was Mrs. Standiford to be removed beyond the circle of her relations and friends, to receive no shelter from the calamities of her hus-

YODER &c.
vs.
STANDIFORD
&c
_____

Dissent of
ch. jus. BIBB.

band, no compassion from society? Were the foun-- dations of social duties to be subverted, the ties of friendship to be dissolved and its offices forbidden? Was society interdicted from all compassion? Were Standiford and family to be repudiated from all so- cial rights, like unto culprits, in the worst days of Roman tyranny, banished upon a charge of violated majesty, and interdicted the use of fire and water? Extravagant as these interrogations may seem, they do but point to the absurd consequences of the ar- guments against the validity of Yoder's purchase at the sale by the sheriff, drawn from the facts, that Standiford and Brooks, the brother of Mrs. Stan- diford, brought Yoder from another county to bid at the sale; that Yoder was an old friend of Mrs. Standiford's father, that Mrs. Standiford's brothers and brother-in-law and mother were anxious for Yoder to become the best bidder at the sale, and that Yoder interfered with intention to aid and assist Standiford and his family. If the acts of Yoder were not unlawful, his benevolent intentions, which accompanied those acts, cannot be converted into a constructive offence against the law. The true ques- tion is, were the acts of Yoder, in acquiring the property at the sheriff's sale, or in the use of that property afterwards, unlawful? That Yoder paid his own money for the purchases on the day of sale, that he used his own credit and means, and not the money, or credit or means of Standiford, has been before stated, as the clear result of the testimony. That the sheriff conducted the sales fairly, without fraud or collusion, is clear. That Yoder was the best bidder is clear, and as such he received the deed of the sheriff for the property so purchased, having paid down $2,513 of his own funds, and complied with the terms of the sale and the law, as to the res- idue of the purchase, of $3,708. How can the friendly intentions of Yoder towards Standiford and his family, be made into "malice, fraud, covin, col- lusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties or forfeitures?" What injury has resulted to the law- ful and just rights of any person by the conduct of

Yoder in purchasing at this sale? None. It is very <span style="float:right">Yoder &c.</span> clear from the evidence, that Yoder has done nothing more than to prevent Phillips from acquiring the whole property for the amount, or perhaps for a small part, of his four executions.

Yoder &c.
vs.
Standiford &c.
_____
Dissent of
ch. jus. Bibb.

The testimony of Mr. Guthrie gives a very practical view of this subject. He had not money to invest in the purchase of property; Phillips' executions were older than his, therefore to be first satisfied; these amounted to near three thousand dollars; so that persons who bid and became purchasers, were purchasers for Phillips' benefit, until the amount of Phillips executions was raised. Mr. Guthrie saw this, and that it would be necessary to push the sales above Phillips' demands, before he could come in with his executions. In attempting to do so, he saw he might be thrown into a large debt to Phillips, instead of getting his own. Therefore Mr. Guthrie sold his executions to Yoder, who entered into a competition in the biddings against Phillips, which Mr Guthrie would not do.

Thus it was, that the property sold for the amount of the six executions. Phillips did bid, but was overbid by Yoder; Phillips would not give the prices which Yoder gave. Phillips had endeavored to prevent Yoder from attending the sale, that he, Phillips, might be the purchaser. If Yoder had not bid, then Phillips, relieved from the competition of Yoder, would have been unwilling to bid the property up to a greater amount than his own executions, if to so much; Standiford's whole estate would have been sold for Phillips' benefit, and Standiford left indebted still upon the judgments and executions in favor of Guthrie. Mr Atterburn, a creditor complainant, was there; he was advised by Phillips to bid, in order to make his (Atterburn's) debt out of the property; Atterburn, however, would not give the prices for which the property sold; he was the best bidder for no article. He was in a worse condition than Guthrie; until Phillips' 4 executions, and Guthrie's two, were satisfied, Atterburn's could not come in. He did not choose to purchase property which he did not want, nor hazard the event

Dissent of
ch. jus. Bibb.

of becoming the debtor to Phillips and to Guthrie, or Yoder, the assignee of Guthrie. Guthrie was unwilling to hazard bids for property to the extent of three thousand dollars, for Phillips' benefit, to secure his debts upon the two executions next in order to Phillips'; Atterburn was unwilling to push the bids up to $3,708, and run the risk of being best bidder in the race, to secure his debt next in order after the six executions of Phillips and Guthrie. Phillips advised Atterburn to bid; in that Phillips had an interest. Atterburn's biddings, with a view to make the property sell for enough to pay the six executions of Phillips and Guthrie, and his own also, if prosecuted, would have pushed up the prices of the property at the hazard of Atterburn, and lessened the danger which Phillips had to encounter, of having property knocked off upon him which he did not want, at the prices which he would be compelled to bid in the race with Yoder, in order to make the sales produce the amount of Phillips' executions. From the examples of what the three creditors, Phillips, Guthrie and Atterburn did, and did not, combined with the acts and means of the other persons who were attending at the sales, the conclusion is irresistable, that if Yoder had not bid, Phillips would have met such feeble competition in his biddings, as that he would have purchased the whole estate for an amount far short of his executions, or at the utmost, the sales of the whole estate would not have overgone his executions.

To argue that Yoder, by his becoming the best bidder at the sale, has been injurious to the just and lawful rights of creditors, or that his interference was with intent to delay, hinder, or defraud them of such rights, is argument against fact. Executions in behalf of bona fide creditors, had been levied upon the whole estate, real and personal, of E. Standiford; the law had provided no security for the debtor against inordinate sacrifices of his property, but in the voluntary biddings of those who should attend at the time and place of sale. Standiford, warned by former examples, feared the most disastrous consequences. He appealed to Yoder's friendship for his family to save them from ruin and beg-

gary. Yoder, with his own means and money, be- came the best bidder. Yoder was as free in law to become the purchaser, as any other bidder. The process of the law arrested and seized the estate of Standiford; the officer of the law proceeded, *in rem,* and according to his authority; as well the creditors whose executions were in the hands of the officer, as other creditors, and all other persons, were, by construction of law, invited to bid; Yoder did bid; the law has had its due course, and Yoder became the best bidder and purchaser, under the authority of the law. To a mind, enlarged by the knowledge of human nature and the foundations of civilized society, impressed with the beauty of social duties and affections, stored with just ideas of moral good and evil, with the rules of right and wrong, and the fair and foul in human transactions, mindful of the fixed distinctions of law between that which is just and unjust, the title so acquired by Yoder from the sheriff at the date of the deed, must appear valid, and entitled to the protection of the law. By protecting titles so acquired, general confidence in the sales by the ministers of the law will be cultivated, competition and better price will thereby be induced, to the general benefit of creditors and debtors; offices of friendship and the social duties will be encouraged, and the ligaments of society and the body politic will be strengthened. By abrogating such titles because the purchaser was not actuated solely by selfish mercenary motives, would involve the absurdity of punishing an act which was lawful in itself, for the intention, when even that was not unlawful; public confidence in the ministers of the law would be shaken; and the tendency would be, to loosen the bonds of social duties and affections, and to demoralize society.

The title of Yoder acquired at the sheriff's sale, being valid, the next inquiry is, has he forfeited that title by his after acts? It is objected to Yoder's right, that the possession of the property has remained with Standiford, and therefore that the conveyance to Yoder must be deemed fraudulent in law. The title of Yoder is derived from the judgments, executions thereon, and the sheriff's sale thereunder.

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

His title and his conveyance is from the sheriff, not from Standiford. By the levy of the executions, Standiford's title was vested in the sheriff; Standiford did not, and could not, convey to Yoder. The conveyance to Yoder by the sheriff includes lands, slaves, and goods and chattels, and is duly recorded within the time prescribed by law. Possession of the lands, the sheriff had not the power to give: Woolfolk vs. Overton, 3 Litt. 24; same parties, 3 Marsh. 69. To obtain possession under the sheriff's deed, Yoder was left to ulterior measures. The possession of the land remaining with Standiford after the sheriff's sale and conveyance, could not be objected to that conveyance with any colour of reason. But even as to the slaves, goods, and chattels, Yoder received his title and possession from the sheriff; as to these it was the duty of the sheriff to deliver the possession to the purchaser. The former right of property and possession of Standiford, as to the slaves, goods, and chattels, were interrupted and broken by the levy of the executions, and by the sale to Yoder. These were notorious acts, done by the officer of the law; the sale was public and in the presence of the vicinage. This constitutes a wide difference between the case of Yoder, and the case of Hamilton vs. Russell, 1 Cran. 310; Twyne's case, 3 Co. 80; and other cases of that kind, wherein the continuing possession of the grantor of a personal thing, notwithstanding his absolute deed to the grantee, was held to be fraudulent. In all those cases, the conveyances between grantor and grantee were the private acts of the parties, and the possession was uninterruptedly continuing with the grantor. In this case the possession has been broken, interrupted, and changed, not by the private secret doings of the parties; but openly, publicly, and notoriously, by the officer, acting under the precepts, and according to the commands, of the law. The sheriff had possession; he sold openly and publicly, and transferred the right of property and possession to Yoder. If the sheriff had continued in possession notwithstanding his absolute sale and conveyance to Yoder, then the similitude in one feature of this and those cases alluded to, would have obtained:

So, if Standiford himself had, by a private act of YODER &c. his own, whilst in possession, conveyed to Yoder, and vs. notwithstanding such deed Standiford's possession STANDIFORD had continued, then the parallel would begin. In &c. the case of a private grant of a personal thing, the Dissent of continuing possession of the grantor, not competent- ch. jus. BIBB. ly explained, does deceive, because of the privacy of the deed, and the publicity of the inconsistent possession. In cases of sales under the precepts of the law, and by the officers acting under its mandates, the transfer of the right of property is public, notorious; the possession is not unbroken; the after possession of the original proprietor, whose right of property the ministers of justice have acted upon, and publicly transferred, is not *per se* fraudulent; its duration only is likely to deceive, when so long protracted as to justify an inferrence of a new right in the possession, acquired from the known grantee under the public acts of the officer of the law. This distinction was recognized by this court in the case of *Greathouse* and *Carrico* vs. Brown, decided in June, 1827. In the case of *Cole* vs. Davies and al. assignees of Maul, bankrupt, 1 Lord Raym. 725; it was resolved: "that if goods of A are seized upon a *fieri facias*, and sold to B *bona fide*, upon valuable consideration; though B permits A to have the goods in his possession, upon condition that A shall pay B the money, as he shall raise it by the sale of the goods, this will not make the execution fraudulent. And in such case, the subsequent act of bankruptcy by A will not defeat the sale."

So in the case of *Watkins* vs. *Birch*, 4 Taun. 823, where a creditor took the goods of the debtor, in execution, (he having confessed a judgment,) and bought them at public auction from the sheriff, and then let them to the debtor for rent, this was ruled not to avoid the sale.

So in *Leonard* vs. *Baker*, 1. M. and S. 251, where the goods of the debtor were sold publickly, by trustees under an assignment for the benefit of creditors, and the son of the debtor's wife purchased the goods, and removed part, but left part in possession of his mother for her accommodation, it

YODER &c.
vs.
STANDIFORD
&c.

was held that the goods so remaining with the debtor were protected from the execution of a judgment creditor, who had notice of the assignment.

Dissent of
ch. jus. BIBB.

So in Guthrie vs. Wood, 1. Starkie's cas: 367, where a tenant had made an assignment for the benefit of creditors; the landlord distrained for rent and the goods were sold upon the distress, the trustee bought the goods out of the trust funds, and afterwards allowed the tenant to continue in possession, it was adjudged that the goods were protected from the execution of a judgment creditor, there being no evidence that the distress and sale were colourable and fraudulent. The chief justice said, that the doctrine relative to possession not accompaying the deed, did not apply so as to make a deed fraudulent, where the conveyance was not by the debtor himself, but by a third person.

Also in the case of Kidd vs. Rawlinson, 2. Bos. & Pul. 59; it appeared that the plaintiff, Kidd, had bought the goods for which he sued of the sheriff who had sold them publicly under an execution against A; after his purchase, Kidd allowed A, (being an inn keeper,) to remain in possession of the goods; afterwards A made a bill of sale of the goods to Rawlinson, the defendant, who took possession of them; the jury negatived any intention on the part of the plaintiff, Kidd, to defeat any execution by A's creditors, thereupon it was ruled by the court that the plaintiff, Kidd, was entitled to recover of the defendant, Rawlinson.

In Meggott, vs. Mills, (1. lord Ray. 286,) the case was thus. Wilson exercised the trade of victualler, and became indebted to Meggott for ale to a large amount; Wilson quitted that trade, and after exercised that of an innkeeper, rented a house of Mills, and borrowed money of Mills to buy goods to furnish the house; for security of the money so borrowed, Wilson made a bill of sale of the goods to Mills, but Wilson retained the possession of them: After Wilson was become innkeeper, Meggott continued to sell him drink, and Wilson became indebted to Meggot in another sum. Wilson not being able to continue his trade, made an agreement with Mills

to give him security for the money lent, by a new
bill of sale of the same goods and others; but before
he executed the new bill of sale, Wilson, by contri-
vance with Meggot, committed an act of bankrupt-
cy; Mills not knowing of the act of bankruptcy, nor
of the trick, accepts the new bill of sale.   There-
after Meggot sued out a commission of bankruptcy
against Wilson, obtained an assignment from the
commissioners of bankruptcy, and thereupon he
brought trover against Mills for these goods.   It was
ruled by Holt, chief justice, at *nisi prius,* and after-
wards in the King's-bench, upon a motion for a new
trial, and assented to by the whole court, that, "if
these goods of Wilson's had been assigned to any
other creditor (than Mills,) the keeping of the pos-
session of them (by Wilson) had made the bill of
sale fraudulent as to the other creditors; but since
the original agreement was thus, and that honestly
and really made for securing the money of the de-
fendant, *Mills, which he had lent to Wilson* for this
purpose, the agreement was good and honest."

In Buller's *nisi prius,* (p. 258,) the doctrine upon
the statute of frauds, and the resolves in Twyne's
case, are stated; then the qualification to the rule
respecting possession is thus laid down:  "But yet
the donor continuing in possession, is not in all ca-
ses a mark of fraud; as where a donee lends his
donor money to buy goods, and at the same time
takes a bill of sale of them for securing the money."

In the American edition of Mr. Starkie's valuable
treatise on evidence, title, Fraudulent Conveyance,
(part IV, vol. 2, p. 616 to 621,) the cases in Eng
land, and in the United States, are collected.   Mr.
Starkie has marked the characteristic and distin-
guishing features of the cases adjudged upon the
subject of possession; and gives the true result in
this lucid manner: "Where the sale is made *bona fide*
by a third person, the subsequent possession by the
debtor will not render it fraudulent, for the act was
not intended to prevent the legal owner of goods
from allowing another person to keep possession of
them."

Upon executions sued by *bona fide* creditors, the

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
Ch. jus. BIBB.

property was sold by the sheriff, according to law and the duties of his office, at public auction; Yoder became the best bidder, and paid his money; he acquired the right of property; he thereby became the legal owner; and, according to the aforegoing decisions, had a right to let, lend, or deposit the property to whomsoever he would, and the suffering the property to remain with Standiford does not invalidate his purchase.

The possession which Standiford held after the sale, is explained by the agreement between Yoder and Standiford, before stated; by that, Yoder reserved and retained the control and dominion of the property. It is said, however, that there is no proof of the execution of that paper. This court must act on it as part of the evidence: no objection was made in the circuit court. Besides, the defendant, Yoder, obtained leave before the hearing, to prove the exhibits referred to in his answers, *viva voce*, at the hearing; and this and the deed of the sheriff, are those exhibits. The doctrine is settled in this court, that exhibits not objected to on the hearing in the court below for want of proof, are to be taken in the appellate court as heard and read, and to be heard and read in this court; that the objection cannot be made for the first time in this court; and this rule has prevailed in cases where no leave to prove exhibits was expressed on the record.

This writing on its face appears as if intended to have the signature of Brooks; but it has been executed by Yoder and by Standiford only. That Yoder would have been willing to get Brooks bound to him for performance of the terms of the lease cannot be doubted. That Brooks would not and did not execute the writing, cannot destroy its legal effect as between those who did execute it, in the absence of suggestion and proof; that it was executed as an escrow, to have force only upon condition that Brooks should execute it. A writing expressing to be the act and deed of a plurality of persons, but executed by a part only of those persons, is nevertheless the act and deed of those who do execute it, unless executed, as an escrow, to take effect only upon condition that all should execute it.

The witnesses say the property sold at low prices. This cannot justify setting aside the sheriff's sale. If that were a ground for relief, but few sales by sheriffs would stand in this country, where estates under execution are sold, not by appraisement, but for whatever shall happen to be bid.

YODER &c.
vs.
STANDIFORD
&c.

Dissent of
ch. jus. BIBB.

The case of Hansford vs. Barbour, 3. Marsh. 515, is a very striking instance of inadequacy of price, and of the refusal of the court to avoid the sale.

Upon the prayer of the bill for specific relief, the complainants have not made out a case to entitle them to have that decree, there is not cause made out in proof to impeach the sale and conveyance by the sheriff to Yoder as fraudulent and void. There is no colour for saying the sheriff acted fraudulently or collusively, or abused the precepts which commanded him to sell the property.

It remains to be considered, whether the complainants are entitled to any decree under their prayer for general relief. This leads to the examination of the writing between Yoder and Standiford, and other facts, after Yoder's purchase from the sheriff. Yoder being the absolute owner of the estate, concedes to Standiford, or to Brooks, in consideration of Yoder's esteem "for said Joseph A. Brooks and Nancy Standiford, wife of Elisha Standiford, who are children of his old friends, old Joseph Brooks and Nancy his wife," the right to purchase the property remaining at the end of the lease, by the payment of $3,500 in gold or silver between the 31st of May and first of July, 1827, but at no time thereafter. Neither Brooks nor Standiford have come under any obligation to Yoder so to purchase, upon the terms specified. The writing gives merely the option as a concession by Yoder, without any correlative stipulation by Standiford that he will so purchase. Yoder, then, is not a mortgagee, nor Standiford a Mortgagor. If the property should have depreciated in value, or by casualty or destruction of part have become of less value than what Yoder gave for it, he has no means in law or in equity to enforce the payment of $3,500. If this

YODER &c.
vs.
STANDIFORD
&c.
——————
Dissent of
ch. jus. BIBB.

court were to order a resale of this property, and it should not sell for as much as Yoder gave, the deficiency cannot be made up to Yoder by any decree over against Standiford. It is not the case of a mortgage, where the mortgagee holds a stipulation from the mortgagor for the debt due, upon which he may resort to the general means of the debtor for any deficit not satisfied by the funds pledged.

The sum of $2,513, raised by Yoder, and paid to the sheriff on the day of sale, cost him so much in specie, due him from the estate of Joseph Brooks, deceased. The executions of Guthrie, of $777 04, were paid to Guthrie by Yoder, in specie; the sale bond by Yoder to Phillips, for the residue of Phillips' debt, was for $418 in paper, making together $3,708. 04, the amount of the six executions. It is said by Phillips, that he received payment of that bond by the hands of Standiford. Yoder and Standiford, by their answers in response to the bill, deny that any part of Yoder's purchase was with money furnished by Standiford, or that Standiford had paid any part of it. Whether Yoder furnished the means to Standiford to pay Phillips' demand on the sale bond, or has since, and before answer, satisfied Standiford, is of no importance. The rule is well settled that a solitary deposition cannot outweigh the denial of the answer. Phillips' deposition and the answers may well stand together. But besides the six executions, Yoder paid to Guthrie for a debt not in execution, 80 or 85 dollars; and for the 300 acres purchased formerly by Guthrie, on a third ex-execution, 40 dollars, which 300 acres Guthrie understands as included in the purchase made by Yoder of the sheriff, and as included in the deed to Yoder and in Yoder's lease to Standiford. If so, Yoder's purchase of these 300 acres of Guthrie was made to consolidate his title to the land bought by him of the sheriff. The several sums paid by Yoder to Guthrie, were paid in specie, and when paid, amounted, with the interest, to $944 50, but without interest, and according to Yoder's bond to Guthrie, on the day of sale, these sums, so engaged to Guthrie, amounted to $897. Whether the 300 acres purchased by Guthrie, and sold by him to Yoder, were, or

were not, included and resold by the sheriff to Yo- Yoder &c.
der on the 14th June, 1823; or whether Yoder com-  vs.
pounded the six executions, with the additional  Standiford
sums paid to Guthrie, or computed only the $3,708,  &c.
and thereof estimated the $2,513 paid on the day of  Dissent of
sale, and the $777 04, and half of the sale bond of  ch. jus. Bibb.
$518, and interest thereon, as specie, so as to pro-
duce the sum of $3,500 in specie, which he was to
have for the property if Standiford should choose
to purchase it, is of no importance.

By what process Yoder bent his will or fixed his
assent to the precise sum of $3,500 as the price to be
paid him, or upon the annual rent of $275, does not
appear. He did so. The property was his own; he
had made sacrifices of his ease, and adventured his
means, to favor the family of his old friend, Joseph
Brooks, dec'd, and to prevent the property of Stan-
diford from being sold at sheriff's sale for prices be-
low what Yoder was willing to give. Having be-
come the legal and rightful owner of the property,
he had a right to seek full indemnity, and such pro-
fit on his adventure as he thought fit, before he
would sell it to Standiford or any other. He had
the right also to prescribe the terms and the time.
He has done so. He has made time an essential part
of the conditional sale held out to Standiford. Be-
ing on the part of Yoder but terms of sale proffered,
resting entirely at the option of the persons to whom
the proffer was made, to accept or not, time is of
the essence of the terms proposed. If time is, or
can be, in any case, of the essence of a contract, so
that non-performance within due time is a forfeit-
ure of the contract, or bar to specific execution, it
must be in this case, where a conditional sale is only
proposed by the one party, but the time is given to
other party, to make his election, and to comply with
the terms. This seems to be of that class of cases
in which the chancellor will not relieve against lapse
of time, and failure to perform within the time stip-
ulated. The case of Kenny vs. Marsh, 2 Marsh. 46,
49, is precisely like the present. Marsh purchased,
at sheriff's sale, the land on which Kenny lived;
Marsh, reciting the purchase on his own execution
and sundry others against Kenny, on the day of sale

YODER &c.
vs.
STANDIFORD
&c.
———
Dissent of
ch. jus. BIBB.

executed to Kenny an obligation, by which he bound himself to reconvey and release to Kenny the title he had so acquired, provided Kenny should in due time pay and discharge the several executions aforesaid as the sale bonds became due, and should in a reasonable time pay Marsh the sum due on his own execution. Kenny failed to pay the executions or to furnish the means to Marsh in due time, so that Marsh himself paid the moneys on the sale bonds. Kenny afterwards exhibited his bill against Marsh for a release of the title. The court declared the transaction not a mortgage, in form or in spirit; that the title vested, by the the sheriff's sale, absolutely in Marsh; of course Kenny could not sell nor mortgage it to Marsh. That "the bond of Marsh must then be considered, as it really was, an obligation voluntarily executed, without good or valuable consideration, by Marsh to Kenny, binding him to convey the land, upon condition that the amount therein mentioned should be paid within the times therein specified. Upon Kenny's failure to comply with the condition, Marsh was under no obligation, legal or moral, to convey the land; the right of Kenny to demand a conveyance of the land under the written obligation of Marsh having been forfeited by his failure to comply with the conditions thereof, it rested with Marsh whether he should have the whole or any part of the land, and upon what terms." A like decision was made between Flowers & Sproule, 2 Marsh. 54. In Harrison vs. Lee, 1 Litt. 194, the Court again, in case of a private sale, with a certificate given by the purchaser, that if the seller paid $400 in twelve months, he should have back the property, took the distinction between a mortgage and a conditional sale, and refused relief to the first seller, Harrison, because he failed to tender the money within the time appointed by Lee. In remarking upon the case, the court say, "there is one circumstance, however, in this case, which is strong enough to repel all others; there was no mutuality in the contract; no remedy in favor of the appellee, (Lee) to recover his money; and it is evident from the writing, as well as from the testimony of the subscribing witnesses, that the appellee was at the

first to run the risk of the life of the slave." To these may be added, Baylor vs. Smither's heirs, 1 Litt. 112–13.

Waiving the question whether a court of equity would have sustained a bill by the complainants, to be substituted in place of Standiford for the purpose of compelling Yoder to accept of the money from them, for the property, upon the terms stated in the writing, it is sufficient to remark, that the bill is not framed with that aspect; the time has elapsed; there is no allegation of a tender to Yoder by Standiford, nor by any one for him; nor any offer by the complainants to pay the money to Yoder.

It seems to me, that the defendant, Yoder, by virtue of his purchase from the sheriff, under the executions of *bona fide* creditors, did acquire an absolute title to the property so sold by the sheriff; that there is nothing to impeach the sheriff's deed as fraudulent; that it would be of dangerous and alarming consequence to impeach the title of Yoder, and filch from him his money by the mere declarations of an intended kindness to the family of Standiford, when it is clear that Yoder purchased with his own means and not with the money or means of Standiford; that the permission given to Standiford to take possession of the property for the purposes, and during the time alluded to in the bill, and exhibits and proofs, has not invalidated Yoder's title, acquired at the sale by the sheriff; and that upon the hearing, the circuit court ought to have dismissed the bill.

*Wickliffe* for Yoder; *Denny* for Massie and al.